or 237195 United States v. Littorio.  Good morning. Benjamin Silverman for Edwin Corte Real, who consented to be extradited here after he was promised that he would not be sentenced either to death or to more than 30 years in  The district court sentenced him to life without parole because it misunderstood and misapplied the prudential standing rule and concluded that this promise, the most important one ever made to him, is outside of his own rights and interests. This court has a very clear test for determining prudential standing in the context of extradition documents. In the words of Suarez at 366, it asks, who has rights and interests under the order that achieved extradition? And to determine that, it looks at both expressed and implied, quote, indications that the order was to confer rights and interests on the individual. In this case, there's much more than an indication. We have a decree, which is the equivalent of a court order, a resolve, a judicial proceeding to which Edwin Corte Real was the sole party. The government has never disputed his testimony at 8206 that he was made these promises before he signed the paperwork to conclude the proceeding. And then the proceeding is codified, or the judgment of the proceeding is codified in this decree. The district court at- I'm just trying to clarify what happened here. The decree is by the president of the Dominican Republic, is that right? It has the president's signature, and it's called a presidential decree. Right. Is that- Well, I mean, I don't know anything about Dominican law. I know that under American law, with respect to extradition, extradition is ultimately a decision of the executive branch. The court makes some preliminary findings that someone is qualified to be extradited, but it's ultimately the president or the president acting through the secretary of state or someone who decides, as a matter of foreign relations, whether the person is actually going to be extradited. So there is some explanation of Dominican law that's not disputed by the parties and declarations by State Department and Office of International Affairs of Lawyers at A-175 and A-347, and they explain the process. It's really a judicial process. There's a proceeding. Edwin Cordreal was a party. He's before a judge. And as I understand it from these papers, from these declarations, the presidential decree is sort of equivalent to, you know, a month after a judgment in this case, there'll be a docketed order, a docketed version of the opinion with the red letters mandate on it. You know, district courts sometimes have stamps with their signature on it. And to resolve this proceeding, the stamp is the president's signature, and they put the stamp of the president's signature on the proceeding. That appears to me to be the case, but it's clear from the record, and including affidavits that were submitted by the government about how this works, that there is a judicial proceeding in the Dominican Republic, and that it is the product of a judicial determination before the Supreme Court of the Dominican Republic whether this person should be extradited. And in this case, Edwin Cordreal consented to that extradition after this promise was made to him on the record. And the government has not disputed, this is at A-350, that law enforcement from the U.S. may have been present in the courtroom as, quote, observers, end quote. And so, the district court says there's no standing, and this is at S.A. 11 to 13, because extradition documents are only enforceable by the foreign country if they come forward. But that's just not the law of this circuit. That's not the law under Suarez. It's not the law under the two cases decided in the two years after Suarez were Vito Garcia and Berenice. And in Berenice, decided in 2017, where the defendant sought to rely on general language in the treaty, not in an extradition decree for him personally, like we have here, but just general language in the treaty of the 1909 treaty between the Dominican Republic and the United States, this court at page 105 assessed, applied the Suarez test, did this create rights and interests for the individual, and concluded no. And in that sense, when the person's relying on the treaty, it's kind of like looking for an implied right of action under Court Vieche. So what you're saying is that if a decree that is about this particular case says this is the position of the Dominican Republic, he's being expedited on this basis, that's different than something that is derived from the treaty? Well, absolutely, Your Honor, for two reasons. First, the test set forth in Suarez, and as it's applied in Berenice, as a case-by-case fact-intensive assessment. It's not... Can you point me to any case in which this circuit has allowed a defendant to rely on anything? Well, United States v. Campbell is an example, where this court affirmed Judge Deary imposing the 50-year limit. Your Honor's opinion as a district judge, which I gather the government didn't approve, and Salinas in 2008, where Your Honor imposed some of the limitations, and there was a dispute over the language, and the ambiguity was not construed in favor of the defendant, but limitations on the life sentence that were clear, and that... And those documents between the United States and Mexico, those were enforced by Your Honor in 2008. Were those cases where the U.S. didn't explicitly agree, and the country, the extraditing country, didn't seek to enforce? So I think that's an excellent pointer. Thank you, Judge Park. So I just want to be clear before I answer to distinguish between the prudential standing question on which this was decided in the district court, and the merits question about enforceability. And so moving... And I think, Judge Park, that your question gets to both. In terms of did the country come forward, no. And in fact, going all the way back to Rauscher, the foundational Supreme Court case, the foreign country did not come forward, right? That's why other circuits don't apply this level of a prudential standing screen. But in those cases, not that I'm aware of, I don't see anything in the record that the other countries came forward before it became enforceable. Because under Suarez, which was subsequent to Judge Lynch's opinion, it's a case-by-case test. And you see in Berenice that it's applied in a case-by-case manner, not in a generalized manner, that just because it's an extradition document, it requires the foreign country to come forward. And it's important to note... Was the document in Suarez different? I thought it was a diplomatic note. I'm not sure if that's different. Yes. And so in Suarez, the defendants sought to assert, to enforce languages in the diplomatic correspondence, which was never produced in this case. Because the government has used the prudential standing issue as a screen to avoid discovery in what would be sentencing Brady disclosures. There's a concession that there was diplomatic correspondence in this case where the Dominican Republic requested the imposition of this limit. The State Department says that they didn't respond. We've never seen the underlying diplomatic correspondence. The government says, well, there's a presumption it doesn't get made public. But protective orders are always put in place on discovery to stop it from being made public. And even classified information gets produced when it has to. And in many of the cases, including... So that's the fact-finding nuance. That would be... That would be some... Well, let me put it this way, Judge Park. The district... Once we get past prudential standing, there's two courses of action. Either the 30-year cap could just be enforced on the present record, which I think is entirely appropriate. Or else if the court wants more of a record, there would have to be more fact-finding, including, for sure, disclosing the diplomatic correspondence. But in particular, at A331, we asked for a subpoena to find out the identities of the law enforcement officers who communicated with the Dominican Republic about the decree. Because Maine Justice's lawyer, David Warner, at A347, paragraph 24, says that he gets the decree from law enforcement, not from the State Department. There are two channels of communication. And he also says, at A351, paragraph 5, that he reviews these decrees to make sure that they list the charges correctly, right? Because he wants to make sure that the charges in the indictment can all be pursued under the extradition decree. That's an implicit concession of enforceability. But most significantly, the government has insisted that the 19-month delay between when Mr. Cordreal was indicted and when it even requested extradition from the Dominican Republic, a presumptively prejudicial delay under Barker and its progeny, they have insisted that that 19 months of delay is justified because they had to obtain a no-seek decision from Maine Justice not to seek the death penalty before the Dominican Republic would agree to extradite. And the decree at A173 to 74 puts the limitation on the death penalty and a sentence exceeding 30 years in the exact same sentence, not even the same provision, the same paragraph, in the same sentence. And the government has never explained how it could have given assurances as to one sentence, one portion of that sentence, but not the other. And in our view, that creates race ipsa evidence that they gave assent to the whole thing. But if the court would like further back talk. I thought that they gave the assurances about the death penalty ex ante. That's why the whole rigmarole of going through the Maine Justice. That's not in the record. And where are those assurances, right? So if the government's view is that it danced around the raindrops and Dominican Republic says we want two things and the U.S. government said we'll give you one, then they should put that into the record. They have adamantly refused. And not only did they refuse to put that correspondence into the record, as they did in the case before your honor in 2008, as they have in numerous cases before this court. Yes, Judge Ledge? No, never mind.  But also, they opposed and we did not receive a subpoena to identify the law enforcement contacts, which are significant for two reasons. One, we wanted to contact the people in the Dominican Republic who handed the decree to U.S. law enforcement, who approved turning over the prisoner to U.S. custody to see if they would come forward, right, just as a standing matter, right, just so we think we have standing no matter what. But the government said they need to come forward, let's find them. So we asked for a subpoena to find out who they are. And we wouldn't get the subpoena. So the government knows who it was in contact with, won't tell us. District court won't issue a subpoena, but that's significant for another issue, which is that when the government... I'm still puzzled over why do these law enforcement contacts matter? Because this... I've always thought that extradition is something that takes place at a higher level and a more formal and diplomatic level than the sort of informal, our cops talk to their cops and they hustle the guy onto an airplane. Well, that's an excellent point, but the limited record that the government has created is that after the State Department provided the initial notice to the Dominican equivalent of the State Department, thereafter, the contacts were made by law enforcement. And so when Maine justice asks to review the decree before they instruct law enforcement to go get the prisoner, right, this is in paragraph 24 of their declaration at 8347, they get the decree from law enforcement. So Dominican Republic is communicating directly with U.S. law enforcement and also notably in the treaty, Article 7, 11, and 12, and this is at A187 to 189, they provide that certain correspondence has to be done through diplomatic channels, but Article 12 talks about conditions that the parties place on the extradition and says nothing about that having to be done through diplomatic channels. But more importantly for these purposes, when this court has set the threshold for the marriage question as substantive assurances by the United States, it has never said that those substantive assurances have to be made by a particular agency or the State Department and that wouldn't make any sense for a number of reasons. It wouldn't make any sense because how would the Dominican Republic know when it's U.S. law enforcement that appears to have been designated to handle the negotiations and to make the contacts to accept the decree, right, to negotiate conditions? And moreover, you know, I was just reading, I see Mr. Rain here, the high profile stuff in the media about Sam Bankman Freed being extradited, when things are hastened and done faster in exchange for concessions by the Department of Justice, that's not the State Department's decision of whether these concessions to get the prisoner here faster are consistent with U.S. law enforcement objectives. That would be the Department of Justice's decision and in this case, what appears to have happened is even though the U.S. had every right under the treaty to say to the Dominican Republic, absolutely not, we won't put up with this 30-year sentencing cap, you know, go come back to us with conditions that we're allowed to enforce under the treaty, they didn't do that. There's no record that they did that. They instead accepted the decree, they had contacts and communications about it that they have not disclosed, that they say they don't have to because it's irrelevant because we lack prudential standing, and then they accept the prisoner instead of slowing things down to insist that they can do it without the 30-year sentence cap. And so he has every right as someone, I just want to fold back and I appreciate the Court's time, this case was decided below on the question of prudential standing. And the question of prudential standing is very straightforward. The government doesn't cite any of the Supreme Court's prudential standing case law because the test is are you asserting your own rights and interests? And when someone has a court judgment issued to them that is used and is undisputed, is that true? But can you just explain in one sentence why Suarez isn't binding on this point for us? Well, Suarez is binding, but Your Honor, so can I explain in three sentences? Sure. Thank you. So Suarez states the test as follows, quote, who has rights and interests under the order that achieved extradition? Right? And then it says there are, it doesn't say that you never, that the individual never has rights and interests, right? It says you look at express or implied, quote, indications, end quote, that the order that achieved the extradition in this case, right, created rights and interests for the individual. So in Suarez and Berenice, what the defendant was relying on, because this is going to be a fact by fact, case by case fact intensive approach, right, in Suarez and in Berenice, what they were relying on was respectively the treaty itself, that is a 1909 document that since this case doesn't apply that treaty, but in that case it was a 1909 treaty between the two nations to which the defendant was not a party, obviously wasn't even alive when it was created, and trying to enforce language under the treaty. And the court said no, the treaty was only existed to create rights for the nation state, not for this individual. That's after Suarez, right? That's after Suarez has decided, but the court still goes through that test of saying, well, is there anything expressed or implied as a, quote, indication that this was to create a right that would be enforceable by the individual. And Suarez, what you have is diplomatic correspondence that the defendant himself would never have seen, not like the judgment that's, you know, told to him preliminarily in court to get him to agree to come here, then he signs the paperwork saying, based on this promise, I will come here, and then he gets the decree. So your argument is that it's distinguishable because of the decreto is different from the diplomatic note there, but in any case it's wrong. Is that a fair? In any case it's wrong. Suarez is wrong. Well, we preserve our objection to the whole prudential standing screen. That's right, Your Honor. But in terms of just applying, because this court is on the minority side of the circuit split on that question, but in terms of just applying Suarez, yes, no, it's factually very different to be trying to enforce correspondence that you've never seen, right, that you're not a party to, right, versus a court judgment that's issued to you to induce you to make a life-altering decision. This court has never said that someone lacks prudential standing. This is what I was getting at before. The decree is issued after he's consented. That's right, Your Honor. But I mean, I... So what you're really relying on is a promise from a Dominican judge to Mr. Quartorell. As a prudential... That induces him to consent to extradition. Well, both, Your Honor, because our understanding is that the decree is just sort of like, you know, in a criminal case here you've got an oral sentencing and then you get the judgment in a criminal case, right, and so in this case you've got the oral pronouncement of a Dominican Supreme Court justice, and then you get the presidential decree that puts a stamp on it. But we think it's really the same thing, but as a... I have trouble... I mean, again, I don't know if you had expert opinions about Dominican law in the record, but I have trouble understanding, and different legal systems are different, so it could be that way, that something that says it emanates from the president is really something that comes from the court. Right. So I think this is pretty clear in the Tom Heinemann declarations. This is... These were declarations that were put in by the government, and on these points we don't dispute them in terms of how the process works in the Dominican Republic, and they explain the process, and it's different from what Your Honor is describing and different than what happens here. For example, there's case law that says in the United States when someone consents to extradition it's really a deportation, not an extradition, but the Dominican Republic and the United States government are both assuming in this case that it's an extradition notwithstanding the consent. So I think, you know, it's different, and in fact in Suarez it's notable that that was a Colombian case, and the whole process is different in Colombia. Other cases are from Costa Rica, you have to go all the way back to the 1980s to an opinion by Judge Weinstein in this part of the country to find where the United States was accused of not abiding by the terms of a European extradition decree, but they imposed them too, but every country does it differently. But what we have here is a judicial proceeding, which is what the Dominican Republic did at least in this case at least today, undisputed between the parties, and the product of the Dominican judicial proceeding is this ruling about the sentence cap that's been codified in the decree the way a criminal sentence is codified in the judgment in a criminal case. And so it's one and the same, and this Court has never said it would be totally upending prudential standing. As a prudential standing to say that someone lacks rights and interests and their own judgment, I understand Your Honor was also... But wouldn't that be the case then, regardless of whether he consented? You see, I've looked at this case and thought, well, isn't the equitable point in Mr. Corderial's favor is that he was duped. Well, I think that's a big part of it. But now as you try to say that the decree is something somehow special and different because in his own case, isn't every situation in which someone is extradited from another country under the assumption that the treaty is going to be complied with and that may have somewhere in the documents some representation from the country, that that's what we're doing. No, Your Honor, because that's not what happened here. This case has nothing to do with the treaty. This case has nothing to do with compliance with the treaty. The treaty does not provide what's provided for in the decree, right? The treaty is not... This is something that is imposed by the Dominican Republic. It's imposed by the Dominican Supreme Court, that's right. And so as a... So we've got the two-step questions. One is... It's imposed by the Dominican Republic for its own reasons. Well, for the benefit of the person. I mean, just like any... They're all for the benefit of... It makes no sense. And this is the reason, I suppose, why a slim majority of the circuits in a rather deep and long-standing circuit split, which the Supreme Court seems resolutely to refuse to resolve, why those courts say, well, it's not something the United States should do to dupe and betray these other countries. On the other hand, it's also a diplomatic process to its roots. And the fact that nations sometimes say something for domestic consumption that they don't then stand up for when they're talking to the United States. The government wouldn't have a leg to stand on if the Dominican Republic had come into court and said, hey, wait a minute, you can't do this, which they have not done. Well, of course, they haven't. They adamantly refuse to tell us who they were in contact with so that we could ask them if they wanted to come forward. But Your Honor... They don't even... They don't even ask if this is a situation in which the Dominican Republic has some strong interest. All they have to do is declare it. Your Honor, just to back up to the first part of what the Court said respectfully, that's not the factual record here. There were some assumptions there that are either not borne out by the factual record here or at odds with the factual record here. We have no idea why any court imposes any judgment or any rule. So I have no idea whether it's for domestic consumption or... But it's still his judgment, whatever the motives of the judges were. It's still the man's judgment, right? He still relied on it. And it's particularly significant because the government... But it's his reliance. And this is what puzzles me, is this argument has never really been made as I understand it, which is he's been specifically mistreated in that he consented under this impression. Well, that's why it's his right and interest. And the government's position is that even though this decree also says that he can't be executed, that they could capitally prosecute him and he could be hooked up to the gurney, drawing his last breaths, clutching this decree, codifying the promise that to him, you know, that this would never happen and that it wouldn't be his own rights and interests to enforce. And we respectfully submit that in addition to being just unjust and bonkers, that is not prudential standing case law. Of course that's his own rights and interests. And I would respectfully urge the court to focus on the facts that are in the record. And the government glosses over them in their brief, but we put them in our main brief and they're in the Heinemann declarations about how this is created in the Dominican Republic. Every country does this differently. And the way that this was created is at least not what's in the record in Suarez. And there's no question that Suarez is a case-by-case, fact-intensive assessment. Otherwise, Borenas would have just said, oh, it's extradition. We don't need to look at whether rights and interests are created for the defendant. Right? And again, that was a treaty to which the guy was not a party or even alive when it was ratified. So this is, the facts here are really important. And they're not the same, Judge Lynch, they're respectfully not the same as some of what Your Honor has posited. They are, in fact, quite the opposite. Whether this is something that's replicated in other countries, I have no idea. Right? I don't know what they do in France. I don't know what they do in Germany. I don't know what they do in any other countries. But we have a record here of how the judicial proceeding worked. And I would also just note as a final point, and I appreciate the Court's time, but we pointed this out at page 54 of our moving brief. The government's using the prudential standing shield not only to stop him from asserting his own rights and interests. And we think that's just a mistake of law. Right? Because they're trying to make this like a political question doctrine case. Right? And say, oh, well, it's just the decisions of the executive branch and we completely defer. That's not what the law of the circuit is. It's a prudential standing question and then there's a merits analysis, but it's a justiciable question. Right? And, but what the government's also trying to do that makes no sense, and we talked at page 54 of our brief about the district court's discretion, right? Is it the government's position, it was implicitly the district court's ruling, and it appears to be the government's position that not only does prudential standing block his ability to enforce it, but it also cabins the district court's sentencing discretion even if it wants to afford comedy. And that also doesn't seem to make sense. But we don't think that the court needs to reach that because it's so clear under the fact-intensive inquiry and the facts and the record in this case that Edwin Corderial has prudential standing. Thank you. Thank you, counsel. We'll hear from the government. May it please the court. My name is Courtney Heavey. I represent the government on this appeal, and I represented the government at the defendant's  The defendant's argument that the district court was bound by a 30-year sentencing cap should be rejected because one, the defendant left standing to bring this claim, and two, the United States government never agreed to the Dominican Republic's unilateral request. So first, taking up standing, and I want to pick off what Judge Park referenced with respect to Suarez, Suarez is on point here and does stand for the position that the defendant lacks standing to pursue this claim. The decreto here, as Judge Lynch also referenced, is part of the extradition process. It's one of the last stops, steps, rather, to effectuate the extradition process. It's through the presidential decree that then there is the authorization to release the particular individual here, the defendant. So there's no difference, there's no meaningful difference to find that in Suarez, where there's a U.S. diplomatic note making an assurance that there is no standing, and while the decreto, which is similarly part of this extradition process and sent through diplomatic channels, would confer standing. And it's backed by other parts of this court's case law. Is there anything in the record specifically about Dominican law that speaks to how the decreto was produced and by whom? Because Mr. Silverman is suggesting that this is, in fact, the stamp of the president's signature is equivalent to the stamp of the clerk of the court on a mandate, and it's simply a product of the judicial process. I don't know that there's anything beyond the Warner Declaration, which I don't think describes how the president goes about preparing the decree, but the decree itself is in the  The decree speaks and cites to the extradition treaty, and it is signed by the president. I don't think there's anything more on the record about So that's the only, you just look at it on its face, the government is saying, we look at it on its face and it says it's issued by the president. Correct. Can I go back, though, to what is represented to have happened in court? One of the things that concerns me is this is almost, it's barely an extradition because this is on consent of Mr. Cuartorell. That is what the defense maintains. Is that correct? Is it correct that the defendant But is it correct that this was, that he waived extradition, in effect, that he waived his right to object to the extradition? I believe he consented to extradition. I believe that required, and I think the Warner Declaration speaks to that. I think that still required the Dominican Republic to find that it was legally sufficient, But he consented on, he gave up whatever right he had to object, it is said, and I'm not trying to find what the evidentiary basis for this is, on the express representation that he would, that the sentence would be limited. The record is the defendant's sworn affidavit stating that the Supreme Court, at his appearance, recited that his cap would be 30 years. And after that, he consents? I actually don't know if the timing, but it's in the, as I understand it, his sworn affidavit is that in this proceeding in which he consented, there was a representation, but we will check that affidavit.  If, well, I mean, it's in the record, we can look it up.  If he has sworn that his consent was premised on this, and I take it there's nothing in the record from the government that contradicts whatever it is that he said, right? That's correct. We have not submitted transcripts or other evidence from that proceeding. And we still don't have a problem with that. With his consent being obtained on a representation that no one in the United States intended ever would be applied? Your Honor, I just, I don't believe, and I don't believe defense cites any case law that would support that the remedy is in a United States court, forcing a United States district court judge to be bound by a statement made in the Dominican Republic from a Dominican Supreme Court where the United States wasn't even part of that process in presenting. So I think the answer there is there's simply no support for the position that this court should be sitting in judgment about what may have been said with respect to the Dominican Republic Supreme Court. I think what we have before us is the diplomatic note and the decreto and the extradition process and the question of, one, does the defendant have standing with respect to this extradition process, and two, was there a promise made by the United States that he would have the standing to effectuate? Was there a promise made by the United States that he would not be executed? That in connection with the seeking his extradition, that would have been part of the assurance. You say it would have been. Was it? Do we have something in the record that shows that, as I've been sort of assuming from the context of the United States going to all the trouble of getting a no-seek declaration from the Justice Department, that that would be communicated to the Dominican Republic because the opinion of the Office of International Affairs was that unless that representation were made, he would not be extradited? But I don't know whether there is something in the record that shows that a representation was made, and that's what I'm asking you. Your Honor, I don't believe that it's in the record, but the affidavit, so the Warner Declaration talks about what is required in the extradition package, and part of what is required in the extradition package is a sworn affidavit from the Assistant United States Attorney. My understanding is that is where there would have been the stated assurance. I see. But that extradition packet is not in our record. That's correct, Your Honor. It is certainly not the government's position, nor has it ever been the government's position, that the source of its obligation with respect to not seeking the death penalty is the credo. The source of the obligation is because the United States made this representation. Correct, Your Honor. And the district court's opinion referenced this in terms of footnotes saying there's a distinction here. When the Dominican Republic wants an assurance, it knows how to get it. And when the United States wants to provide an assurance, it knows how to get it. And I think it's also of relevance that- Can I just ask you, should we read anything into the fact that this decree, it appears somewhere in the government, was received prior to the extradition occurring, prior to him being taken into custody. And so does that not, you know, the fact that the government, some part of the government it seems, has received this document from the Dominican Republic saying, you know, we understand, no death penalty, no 30 years, what have you, prior to this all taking place, does that have any significance as an implicit assurance or acknowledgement or something of that sort? No, Your Honor. I think a couple of things. One, it doesn't change the fact that the Dominican Republic has never objected. Two, the United States cannot implicitly agree to provisions in a unilateral document. I think it's set forth in Cuervas, it's set forth in the affidavit that the way these things are negotiated is through very official diplomatic channels. It's the Department of State that issues its diplomatic channels and notes so that the public responds with its diplomatic notes. Also I think it's relevant that the treaty provides that the Dominican Republic has the ability to reject extraditing on the basis of not seeking the death penalty. It does not have that ability with respect to sentencing limitations. So I think it says something here that, in fact, the Dominican Republic likely handed him over because they knew they could not have stood on a refusal to extradite on the basis of a sentencing cap pursuant to the agreed upon terms in the treaty. And there is no case law that suggests that an extraditing country can unilaterally impose conditions or assurances from the receiving country. I see that my time is up. Unless the court has further questions, the government would rest on its submission. Thank you, counsel. We'll hear from you. Thank you. The government has just cited certain things that are not in the record that are foundational to its case, which, if anything, just buttress the need to further develop the record. Judge Lee, we absolutely think that Your Honor is right on the acquiescence by the United States, and that just gets to the wrongfulness and why it's not consistent with American justice to say, well, and again, at A350, 351, the government OIA doesn't dispute that law enforcement from the U.S. was present as, quote, observers, end quote, when this process happened in the U.S. courtroom. They say they were only observers. Okay. So they're there. They see what happens, right? They get the decree. And even if they're silent at that point, then they're acquiescing. But we don't have to get there. I don't understand why what agents do in the Dominican Republic while they're observing a proceeding or what agents say to their corresponding law enforcement sources at a time when someone is turned over binds the United States in a diplomatic context. That seems to me to be the one thing that clearly isn't the law. Because the record in this case is that it was DOJ and DOJ's agents that took over the negotiations and that the State Department, after it made, so the government has just I'm not talking about the difference between the Justice Department and the State Department. I'm talking about people on the ground acquiescing in something is very different than a formal exchange between governments at whatever level. That certainly is true. We still think it would be enough. But even if the court doesn't think it's enough, we would still need more discovery because certainly if they made explicit statements, that would be sufficient. Because the record of this case, and the government just talked about official diplomatic channels. But the record of this case is that after the State Department provided MERECs, which is the Dominican Republic's equivalent of the Department of State, after they provided them with notice, they really didn't have anything to do. So when Maine Justice is trying to find out the limitations to get the decree in their own words to check to make sure that all the charges are correct, which implicitly concedes enforceability of the way he writes it in his declaration, says it's generally what he does when he gets these decrees, right, he checks to make sure all the charges are correct, right, you wouldn't do that if it's not an enforceable document. But who does he get it from? He gets it from his people on the ground, right, who are the agents. And so if the, that is why we asked to identify the agents so we could speak with them, right, and if we needed to call them as witnesses to see if they made explicit representations, which absolutely would bind the United States. Could I go back to the diplomatic correspondence for a moment, which is something that you also want to get in discovery? There's often mysterious things that happen in government about what can be disclosed and what can't be disclosed. Would I be correct in my reading of the various statements about the record that have been made that although the actual correspondence has not been disclosed, the contents of that correspondence have been sworn to by an official of the United States? Some of the contents of the correspondence have been disclosed. We don't know whether it's complete. And frankly, with all due respect, I don't think we should be relying on the Ipsy-Dixit of government lawyers. I have a top-secret security clearance. These are not classified materials, far more protected documents, and as I said, this would be sentencing rating absent the government's argument about the prudential standing screen. They are absolutely required to disclose this. And so there are absolutely ways that can be done, you know, I'm not about to go take this to the press and I comply with all court orders as an officer of the court, but my client's entire life rides on this. And I think the court does understand the tremendous unfairness of the situation, right? He's deported while under investigation. They bring him back here. They make promises to him, right? Promises are made to him. He signs his name. They've never disputed his declaration. They've put in declarations but not disputing the facts that our client set forth and certainly not doing what they usually do if they think someone lies, which is seek an obstruction enhancement. They're basically acknowledging that he's telling the truth about what happened in the Dominican Republic. And then they bring him here and there's just a complete reneging. And not only is there reneging, but as I said earlier, the government's position is not only that he can't move to enforce the decree, but that the district court can't enforce it on its own accord if it finds that it's appropriate, which is what it persuaded the district court. Absent assertions by Dominican officials, and Judge Wentz, I just want to address this because Your Honor raised this earlier, if it was so important to the Dominican Republic. No one's going to pretend that Edwin Correal is so important to anyone except for me, right? I've been with him for four years now, almost since a little after he got here, right? But imagine an extradition out of the southern district, out of this courthouse, right? And somebody is sending letters in Arabic or Japanese to this courthouse trying to find whoever issued this judgment if they want to make a statement on the record in the Japanese or in the Thai or in the Italian proceeding that it was important to them. It's going to fall on deaf ears. Just like some kind of pro se correspondence goes to the courthouse. That's what my correspondence to the Dominican Republic has been like. And that's why I asked the government to say, well, who did you speak with? Who gave this to you? Who were you working with down there, right? Let me talk to them with an interpreter and see if they want to actually assert, you know, what they did. And the government says, no, we don't have to tell you. And the district court says, no, they don't have to tell you. And that only dramatically enhances the unfairness. But again, we don't think the court needs to get to that, right, and the denial of our motion to compel in the subpoena because we think that we've established potential standing just based on the facts at 8343 to 8345, which Judge Lynch goes to your question about whether there is a description of the Dominican judicial process and how this decree was created. And that's coupled with A206, which is Edwin Corte Real's sworn declaration. It's electronically signed because I did it with him during COVID. But it's an uncontested declaration by the defendant about what happened. And just as two very final points that will be very brief, Judge Park. Number one, the government is asking the court to make assumptions, which the court has made, but unfounded assumptions about what's in the record to try to square the circle about how it can get 19 months of delay because it needs to provide assurances about the death penalty, but somehow didn't provide assurances with respect to the Dominican Republic's actual demand about sentencing, which contains two provisions. And that just can't stand, and it just doesn't make sense, and it seems almost like playing fast and loose with a man's life. And the second thing is that this court has never said that someone lacks prudential standing to enforce their own promises and their own judgment. And that's whether you conceptualize, because there's a lot of odd conceptualization here. It's an odd area of law. But if you conceptualize it as his judgment, you know, because we're trying to come up with equivalents under our law. There's no perfect equivalent. It's not going to be perfectly consistent with a judgment in a criminal case or a mandate of this court because it's Dominican. But the question is, does it create rights and interests for him, right? And it says Edwin Cormier out at the top. It only talks about him. It codifies the promise that's made to him in a judicial proceeding as approved by the person who has the president's stamp, signature stamp, right? This court has never said that someone lacks prudential standing to enforce that kind of judgment or promise, and it shouldn't say so here where so much is on the line for someone who trusted the good faith of the United States. Thank you. Thank you, counsel. Thank you both. We'll take the case under admonition.